IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                                        Case No. 3:16cr94

TRAVIS D. BENNETT, *et al.*,

Defendants.

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Travis Bennett's Motion Requesting

the Court Find Him Incompetent to Stand Trial (the "Motion"). (ECF No. 84.) The United

States responded, (ECF No. 85), and Bennett replied, (ECF No. 86). The Court held an

evidentiary hearing at which Bennett's investigator, Bennett's expert, and the United States'

expert testified. (*See* ECF No. 81.) The Court heard oral argument and ordered supplemental

briefing. (ECF Nos. 89, 90.) The matter is ripe for disposition. For the reasons stated below,

the Court DENIES Bennett's Motion. (ECF No. 84.)

### I. Procedural History

On July 11, 2016, Bennett was charged in a Criminal Complaint with Interstate

Kidnapping of a Minor, in violation of 18 U.S.C. § 1201(a)(1). On August 2, 2016, Bennett was

charged in an indictment with Interstate Kidnapping of a Child and Aiding and Abetting, in

violation of 18 U.S.C. §§ 1201(a)(1), 1201(g)(1), and 1201(g)(2). He was arraigned and entered

a plea of not guilty on August 15, 2016. On September 21, 2016, Bennett moved to continue the

trial date in order to investigate fully Bennett's "long and complicated mental health history."

(Mot. Continue Trial Date ¶ 4, ECF No. 43.) The Court granted that motion and continued the

trial to February 9, 2017.

On January 3, 2017, Bennett filed a Motion to Determine Competency of the Defendant

(the "Motion for Competency Hearing"). Bennett also filed under seal a copy of a neuropsychological evaluation of Bennett conducted by Dr. Drew Nagele. The Court granted the United States' request to obtain a second competency evaluation of Bennett, including allowing the United States' expert to review Dr. Nagele's report. On March 10, 2017, the United States filed under seal a competency evaluation of Bennett conducted by Dr. Bernice A. Marcopulos. On March 16, 2017, the Court held an evidentiary hearing at which Dr. Nagele, Dr. Marcopulos, and Bennett's Investigator, Linda McGrew, testified. The Court ordered Bennett and the United States to submit a joint briefing schedule regarding Bennett's competency. On April 4, 2017, Bennett filed the Motion, (ECF No. 85), the United States Responded on April 12, 2017, (ECF No. 86), and Bennett replied on April 17, 2017, (ECF No. 86).

The Court heard oral argument and ordered supplemental briefing on the procedures that would apply if the Court found Bennett incompetent to stand trial. The United States and Bennett filed their supplemental briefs, and the matter is ripe for disposition. (ECF Nos. 89, 90.)

## II. Legal Standard

"[T]he conviction of an accused person while he [or she] is legally incompetent violates due process." *Pate v. Robinson*, 383 U.S. 375, 378 (1966) (citing *Bishop v. United States*, 350 U.S. 961 (1956)). Title 18 of the United States Code, Section 4241 provides the standard by which a district court determines a defendant's competency to stand trial.

> If . . . the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him [or her] mentally incompetent to the extent that he [or she] is unable to understand the nature and consequences of the proceedings against him [or her] or to assist properly in his [or her] defense, the court shall commit the defendant to the custody of the Attorney General.

18 U.S.C. § 4241(d). Thus, a court assessing a defendant's competence to stand trial must determine first if the defendant "is presently suffering from a mental disease or defect," and, if so, whether that disease or defect "render[s] [the defendant] mentally incompetent to the extent that he [or she] is unable to understand the nature and consequences of the proceedings against him [or her] or to assist properly in his [or her] defense." *Id.*

"It has long been accepted that a person whose mental condition is such that he [or she] lacks the capacity to understand the nature and object of the proceedings against him [or her], to consult with counsel, and to assist in preparing [a] defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). An assessment of competency requires the court to determine "whether [the defendant] has sufficient present ability to consult with his [or her] lawyer with a reasonable degree of rational understanding—and whether he [or she] has a rational as well as factual understanding of the proceedings against him [or her]." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (internal quotation marks omitted). A criminal defendant faces many "strategic choices: In consultation with his [or her] attorney, he [or she] may be called upon to decide, among other things, whether (and how) to put on a defense and whether to raise one or more affirmative defenses." *Godinez v. Moran*, 509 U.S. 389, 398 (1993). In order to be competent to stand trial, a criminal defendant must have the ability to consult with his or her lawyer and make these decisions with a "reasonable degree of rational understanding." *Dusky*, 362 U.S. at 402.

"'Not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges.'" *Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000) (quoting *United States ex rel. Foster v. DeRobertis,* 741 F.2d 1007, 1012 (7th Cir. 1984)). "If the mental illness does not

deprive the defendant of the ability to understand the proceedings rationally as well as factually, then the illness is irrelevant for the purposes of determining competency." *United States v. Leggett*, 162 F.3d 237, 244 (3d Cir. 1998) (internal citations, quotation marks, and alterations omitted). "[N]either low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." *Id.* (citing *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995)).

In evaluating whether a defendant has proven by a preponderance of the evidence that he or she is incompetent to stand trial, the court must "look at the unique circumstances of the case and decide whether the defendant (1) has the capacity to assist in her or his own defense and (2) comprehends the nature and possible consequences of a trial." *United States v. Leggett*, 162 F.3d 237, 242 (3d Cir. 1998). The decision is fact-specific, and "[t]here are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Drope*, 420 U.S. at 180.

### III. Evidence Presented

The Court received two expert reports: one from Dr. Drew Nagele and one from Dr. Bernice Marcopulos. It also heard testimony from both experts and from Linda McGrew, Investigator for the Richmond Office of the Federal Public Defender ("FPD").

#### A.    Investigator Linda McGrew's Testimony

Investigator McGrew testified that she and Bennett's counsel maintain frequent contact with Bennett. Either Investigator McGrew or Bennett's attorney have met with Bennett in person once per week since his incarceration in August, with the exception of the month of January. Also, either Investigator McGrew or Bennett's attorney speak on the phone with

Bennett "at least three to five times a week, and sometimes multiple times on the same day."

At some point, Investigator McGrew became concerned about Bennett's mental status because he seemed "unable to retain or remember things that ha[d] been told to him in previous meetings," and he was telling Investigator McGrew things that she believed were inaccurate. (Tr. 15.) Investigator McGrew conducted a "social history investigation" of Bennett, which involved interviewing people in Bennett's life and "gathering records to document the things that [she had] discovered." (Tr. 16.) During this investigation, Investigator McGrew learned from family reports that Bennett had to be resuscitated as a baby, and that he had suffered several head injuries, including being dropped on a cinder block porch as a baby, being involved in a go-kart accident around the age of six, and being hit in the face with a pipe when he was approximately eighteen. Several of these incidents were chronicled in medical records. (*Id.*) Based on the information she uncovered, Investigator McGrew concluded that Bennett needed further neurological testing.

Investigator McGrew and others in the FPD also reviewed 210 phone calls Bennett made from jail, seventy-one of which were substantive, and took notes summarizing the calls. Comparing what Bennett recounted in the phone calls with what Investigator McGrew knew she and Bennett's counsel had told Bennett, "[w]hat stood out to [her] is that [Bennett is] able to take fragments and pieces of the conversations that we have with him, but he's not able to remember them accurately." (Tr. 29.) Investigator McGrew testified "that there's a lot of inaccurate information in the phone calls [Bennett makes] to his family members." (Tr. 29–30.) For example, Bennett has stated that his attorney can "get [him] off" or that he can "beat this at trial." (Tr. 30.) Bennett also told people that he had been offered a plea for ten years, or for seventeen years, but he has received no such offers. And although Investigator McGrew admits that it is

common for criminal defendants to have an optimistic view of the outcome of their cases, "the

level of misrepresentation that [Bennett] states in the phone calls goes beyond the norm that

[she] ha[s] seen over the last 15 years being in this office." (Tr. 39.)

> [I]n the normal course of the case, usually you can move a client down the road
> and get them to the point where they understand, and understand realistically what
> they're facing, and how severe it is. But with [Bennett], we have not been able to
> do that. . . . [T]he difference between [Bennett], and other clients, is the fact that
> he is stuck and cannot be moved forward.

(Tr. 41.)[1]

Investigator McGrew also acknowledged that some of the facts Bennett recounted in the

phone calls were accurate. He stated that his attorney has discussed with him "taking the 20-year

mandatory minimum off the table," and that, as charged, he is facing a punishment of twenty

years to life in prison. (Tr. 32–33.) He discussed in one phone call that the charges against one

of his co-defendants had been dropped, and that his trial was set for October 11, 2016.[2] In that

same phone call, Bennett also told family members that they would need to bring him street

clothing for his trial. He also relayed to one of his family members which medication he was on,

and that "it would mess with his kidneys." (Tr. 38.)

---

[1] The majority of Investigator McGrew's testimony, based on her substantial experience working with criminal defendants, had persuasive value. But some of her testimony veered toward diagnoses she is not trained to make. Investigator McGrew testified that Bennett "suffers from a traumatic brain injury," and that he "has spontaneous false memories . . . that he produces spontaneous false memories without any intent to deceive." (Tr. 40.) This testimony too closely aligns with Dr. Nagele's testimony that Bennett is "pulling on the wrong memory stores," and "filling [lack of memory] in with incorrect information," (Tr. 78), muddying this Court's ability to assess Investigator McGrew's opinions as independently reached. Moreover, later in the hearing, Dr. Nagele's testimony suggested that such conclusions can only be made through medical expertise. Investigator McGrew in no way attempted to mislead or misinform the Court. But the Court cannot give weight to such expert testimony from a non-medical expert.

[2] Bennett's trial was at one point set to begin on October 11, 2016. (*See* ECF No. 33.)

**B.    Dr. Drew Nagele's Report and Testimony, Offered by Bennett**

### 1.    Dr. Nagele's Qualifications

Dr. Nagele was offered and accepted as an expert in neuropsychology.[3] Dr. Nagele has experience testifying as an expert in county, state, and federal courts. He has testified as an expert in neuropsychology approximately three or four times per year over the last nineteen years. Dr. Nagele has conducted approximately five evaluations of a defendant's competency to stand trial, but has never testified as an expert regarding competency to stand trial. He has no specific training in conducting competency-to-stand-trial evaluations. He has co-authored one article, in 1996, regarding competency to stand trial.

### 2.    Dr. Nagele's Opinions

Dr. Nagele was retained by Bennett's counsel to conduct a "comprehensive neuropsychological evaluation." (Tr. 66.) He did not conduct a separate evaluation for competency to stand trial. As part of his evaluation, Dr. Nagele reviewed medical records supplied to him by the FPD[4] and relevant information from "collateral sources." (Tr. 67, 73.) He then met with Bennett for approximately eight hours over two days on December 8 and 9,

---

[3] Dr. Nagele earned his Bachelor of Science degree in Psychology from Ursinus College, his Master of Arts degree in Community Psychology from Temple University, and his Doctor of Psychology degree in Professional Psychology from Central Michigan University. He is a licensed Psychologist in Pennsylvania and New Jersey. He is trained as a neuropsychologist and has been practicing in that field for approximately thirty-three years. His career has been primarily focused on "creating and running brain injury rehabilitation programs" for individuals of all ages. (Tr. 57.) He has experience working with patients clinically, training new clinicians, and teaching neuropsychology and neurorehabilitation. He currently serves as the Executive Director of Beechwood NeuroRehab, a healthcare organization serving individuals who have acquired brain injuries.

[4] Dr. Nagele reviewed sixty-six reports spanning from Bennett's birth in 1982 to 2014. (Nagele Report 1–3.)

7

2016. During that time, Dr. Nagele administered seventeen tests designed to measure numerous neurological abilities.[5]

Only after he had conducted his evaluation did Bennett's counsel ask Dr. Nagele to assess Bennett's competence to stand trial. Without meeting Bennett again, but "[b]ased on [his] analysis of the test results, as well as the records received, [and] the information contributed by collateral sources, [Dr. Nagele] concluded that Mr. Bennett has severe cognitive impairments." (Tr. 73.) He also opined that Bennett "does not have sufficient cognitive ability to consult with his attorney, form a reasonable degree of understanding about the nature and consequences of the proceedings, or the capacity to really make good decisions for himself or to understand the options that might be presented to him."[6] (*Id.*) Dr. Nagele later reviewed seventy-one phone

---

[5] For example, Dr. Nagele administered the Halstead-Reitan Neuropsych Test Battery, which measures higher order cognitive functions; the Wechsler Adult Intelligence Scale, Fourth Edition, which measures intellectual functioning; the Wechsler Memory Scale, Fourth Edition, which measures memory functioning, visual, auditory, and spatial memory for novel information; the Wechsler Individual Achievement Test, Third Edition, which measures achievement; the Adaptive Behavior Assessment Scale, which measures adaptive functioning; and the Texas Functional Living Scale.

[6] In his report, Dr. Nagele also stated the opinion that Bennett's "impairments preclude [him] from appreciating the criminality of his conduct in the matter at hand." (Nagele Report 14.) This conclusion speaks to the standard required for an insanity defense. *See* 18 U.S.C. § 17 ("It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts.").

The issue of a possible insanity defense is not before the Court. Bennett has provided no notice of an intent to present such a defense as required under the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 12.2 ("A defendant who intends to assert a defense of insanity at the time of the alleged offense must so notify an attorney for the government in writing within the time provided for filing a pretrial motion, or at any later time the court sets, and file a copy of the notice with the clerk. A defendant who fails to do so cannot rely on an insanity defense.").

calls that Bennett made from jail and Bennett's post-arrest statement, which "reinforced [his] conclusions" regarding Bennett's competency.[7] (Tr. 77.)

### a. Bennett's Brain Injuries

After reviewing Bennett's medical records, speaking with family members, and administering numerous tests, Dr. Nagele concluded, "within a reasonable degree of [n]europsychological certainty, [that Bennett's impairments] are the result of multiple brain injuries beginning at birth and occurring throughout [Bennett's] lifespan." (Nagele Report 14.)

Dr. Nagele testified that Bennett suffered an anoxic brain injury—a nontraumatic brain injury—at birth. Evidence also indicates that Bennett was dropped on a cinderblock floor as a baby. This "potential traumatic brain injury, . . . occurring very early in that period where great maturation is expected to occur," would affect "normal [brain] development." (Tr. 91.) Dr. Nagele next pointed to a go-kart accident when Bennett was approximately eight years old, and "if he hit his head, that would have been characterized as another traumatic brain injury." (Tr. 92–93; *see also* Nagele Report 4.) Finally, at approximately age eighteen, Bennett was hit in the face with a pipe.

Dr. Nagele found these multiple brain injuries meaningful because although "one acquired brain injury causes whatever damage it causes[,] . . . the effects of multiple injuries are cumulative." (Tr. 95.) If a brain is subjected to "repeated injury, [there will be] a cumulative

---

[7] Dr. Nagele testified that in his review of Bennett's phone calls, he heard Bennett "confabulate . . . information [and] use it in various different ways that were actually inaccurate." (Tr. 82.) Dr. Nagele described confabulation as a process common to all people in which "we recall[] key elements or bits and pieces [of an occurrence], and then our brains tend to fill in the gaps [with] what we think is most likely the rest of the information that went with those key elements." (Tr. 78.) Generally, he testified, people of average intelligence, intellectual ability, and higher order cognitive function are able to fill the information in accurately. But Bennett is "way off in terms of how he's able to fill out the story when he's later recalling it." (*Id.*) Dr. Nagele observed that, during the phone calls, Bennett would relay information "in different ways over different conversations." (Tr. 100.) Dr. Nagele heard in the phone calls "the very inconsistency over time that is characteristic of a person who has a memory impairment." (*Id.*)

effect of those damaged [brain] cells." (Tr. 96.) "[W]hen you have one brain injury, and then you have impairment from that, and then you get another brain injury, . . . there's additional impairment and it accumulates." (Tr. 125.)

Dr. Nagele also found the times in Bennett's life at which these injuries happened problematic because at least two of them happened at a young age, when Bennett's brain would have been undergoing a "great period of development." (Tr. 90.) "[A]ny injury that occurs [at the beginning of a period of brain development] has the potential to severely disrupt the maturation that is expected to occur subsequently." (*Id.*) And Dr. Nagele found the injury in which Bennett was struck in the face with a pipe especially significant because "the forces that get transmitted in an injury like that [affect] the parts of the brain that sit in the frontal lobe and temporal lobes, [which] are particularly susceptible to forward injury . . . ." (Tr. 94.) "[D]amage to the head, the forehead, [and] the nose . . . is particularly going to cause problems with behavior and emotions."[8] (*Id.*)

At approximately age ten, Bennett "received an MRI of the brain which showed multiple lesions of the white matter of the frontal lobes."[9] (Nagele Report 4.) Dr. Nagele found this

---

[8] Dr. Marcopulos disagreed with Dr. Nagele's diagnosis of this incident as a brain injury. She testified that "the ER records did not indicate that [the blunt force trauma impacted Bennett's brain development]." (Tr. 212.) Instead, Dr. Marcopulos testified that the ER records indicated that, at the time Bennett suffered that injury, he did not "show any signs of alteration in consciousness, or anything that would suggest actual brain injuries. . . . [W]hen your head receives a trauma, it doesn't always mean that your brain has received a trauma." (*Id.*)

[9] Dr. Marcopulos disagreed with Dr. Nagele's characterization of the spots on the MRI as "lesions." She testified that the spots had first been referred to as "lesions" in a psychiatrist's report referring to the MRI. "[T]he original neuroradiology report" of the MRI referred to the spots as "unidentified bright objects, meaning they didn't know what it was. And . . . it was of unclear clinical significance. When someone has a brain injury, it shows up as scar tissue on the brain, and the neuroradiologist can identify that. [Dr. Marcopulos] took [the spots] as possibly suggest that it might be reflecting the anoxic event that [Bennett] had around his birth." (Tr. 213–14.)

"significant . . . because many times after brain injury we see no findings on scan. . . . So having a finding on scan [sic] that is big enough to see with the naked eye means that it is quite a significant finding[.] And that there must have been significant enough damage occurring . . . beyond just the cellular level." (Tr. 96.) Moreover, the lesions appeared in the frontal lobe, which Dr. Nagele found significant because "the frontal lobe is the lobe that's responsible for decision-making, evaluating, monitoring, regulating, planning, and problem-solving. And so when you have damage in the frontal lobes, you have problems in all of those areas." (Tr. 97.)

### b.   Dr. Nagele's Testing

Dr. Nagele administered to Bennett multiple tests designed to evaluate Bennett's intellectual and memory abilities and his adaptive functioning. Overall, Dr. Nagele concluded that Bennett

> is functioning in the Borderline to Extremely Low range for intellectual functioning, in the Severely Impaired range for verbal memory and higher executive functions, and in the Extremely Low range for Adaptive Functioning. His reading, writing, and money handling ability are so impaired that he would not be able to function without assistance in everyday life, and he is at risk for being taken advantage of.

(Nagele Report 13.)

### i.   IQ Testing

Dr. Nagele administered the Wechsler Adult Intelligence Scale, which measures intellectual functioning. According to this test, Bennett has a full-scale IQ of 71—in the third percentile, and somewhere between the Extremely Low and Borderline ranges.[10] Within the four different subsets of the test, there was "significant unevenness in his intellectual functioning, . . . suggesting that there is variability in the way that [Bennett's] brain is working compared with this overall intellectual rating." (Nagele Report 6.) Bennett's scores varied from a low of 70 on

---

[10] This score is consistent with Bennett's previous IQ scores.

the Verbal Comprehension Index, in the second percentile and the Borderline range, to 77 on the

Working Memory Index and the Perceptual Reasoning Index, both in the sixth percentile and the

Borderline range, to a high of 81 on the Processing Speed Index, in the tenth percentile and the

Low Average range. (*Id.*; Tr. 111.) This level of variability "is suggestive of neurological

impairment that has created significant variability in overall brain function." (Nagele Report 7.)

Bennett was weakest in the Verbal Comprehension Index, which "measures things like

reasoning ability, and verbal comprehension, understanding words and their meanings."

(Tr. 110.) Ultimately, Bennett's "verbal weaknesses in combination mean that [Bennett] has

very little ability to form, understand, and express verbal concepts." (Nagele Report 8.) And the

combination of his verbal weaknesses with his relatively average processing speed means that

"[Bennett] is rather quick to process information, but frequently does so with many errors in this

cognitive processing." (*Id.* at 6.)

### ii.    Memory Testing

Dr. Nagele administered to Bennett the Wechsler Memory Scale, which measures

memory functioning and visual, auditory, and spatial memory for novel information. Overall,

Bennett scored below average on each individual memory index. However, there was "a great

deal of variability with [his] memory scores, [indicating] a pattern of multiple brain injuries

against an initially normal brain." (Nagele Report 8.) Bennett scored 72 on the Immediate

Memory index, in the third percentile and the Borderline range; 78 on the Auditory and

Immediate Memory index, in the seventh percentile and the Borderline range; 81 on the Visual

Memory index, in the tenth percentile and the Low Average range; and, 60 on the Visual

Working Memory index, in the 0.4 percentile and the Extremely Low range.

Bennett's low Working Memory score means it is "more difficult for him to keep

something in his head while he's working with it." (Tr. 111.) During the testing, Bennett had "the greatest difficulty with remembering a short story he was told, and then later coming back and re-telling that story[, . . . . which] is the most common form of memory demand in everyday life, to be able to recall, at a future date, what someone has said to you earlier." (Nagele Report 9.) Ultimately, Dr. Nagele concluded from his tests that "[t]he combination of [Bennett's] impairments in verbal intellectual abilities with his impairment in forming and recalling verbal memories makes it virtually impossible for him to function effectively in everyday life." (*Id.*)

In what ultimately drove his opinion regarding Bennett's competence to stand trial, Dr. Nagele testified that two of the memory test subsets on which Bennett scored the lowest are most similar to "a witness testifying at trial" or "a teacher teaching in a classroom." Dr. Nagele opined from his testing that, if Bennett were to sit through "a day's proceedings," Bennett would not be able to remember everything that was said, nor would he have the capacity to "figure out which facts are relevant and which ones he has to use in his decision-making." (Tr. 75–76.) Because Bennett's reasoning ability is impaired, "even if he had all the information, I'm not sure if he would be able to make, you know, an informed decision. But if you add memory impairment to the impaired reasoning, there's just no way that he can . . . make a reasonable decision about his options." (Tr. 119.)

### c.    Bennett's Competence to Stand Trial

With regard to his competence to stand trial, Dr. Nagele concluded that Bennett

> does not have sufficient cognitive ability to consult with his attorney and form a reasonable degree of understanding of the nature and consequence of the proceedings, nor does he have the cognitive capacity to understand the full nature of the proceedings against him. [Bennett's] verbal memory impairment would preclude him from reviewing the facts of the case one day, and coming back the next day to discuss them . . . . This would also apply to testimony that would be

heard in the trial proceedings. He would not be able to remember it from one day to the next. His reading and writing impairments would preclude him from accurately writing down these facts, or reading what someone else has written down, as an adjunct to impaired memory. These impairments therefore severely limit his ability to understand the nature and object of the proceedings against him, and to consult with his attorneys, and to assist them in preparing his defense.

(Nagele Report 14.)

Dr. Nagele testified that Bennett "would [not] be able to" make decisions about whether and how to put on a defense. (Tr. 130.) "I think he would be able to respond to [counsel's] ideas, but if you were really asking him to make a decision, he would have difficulty." (*Id.*) Regardless of what decision he was making, Bennett would not "have enough information available at one moment in time to apply reasoning because that would take . . . understanding the implications of each of those courses of actions. . . . [I]t's not enough to remember facts. You've got to be able to use that information, and think about the downstream consequences of each decision." (Tr. 130–31.) Dr. Nagele testified that he did not believe Bennett would be capable of making those decisions.

Dr. Nagele, however, never tested his conclusions by asking Bennett any questions about the pending charges against him or his upcoming trial.[11] As the Court later explains, Dr. Nagele's failure to test—directly—Bennett's understanding of *this* case in *this* Court render his opinions regarding Bennett's competence to stand trial significantly less reliable and helpful to this Court's determination of Bennett's competency than Dr. Marcopulos's testimony based on a direct assessment of those issues.

---

[11] Dr. Nagele testified that he did not discuss with Bennett "the specific aspects of what he is charged with in federal court" because "[t]hat wasn't part of the evaluation when [Dr. Nagele] saw him." (Tr. 140.)

## C.   Dr. Bernice Marcopulos's Report and Testimony

### 1.   Dr. Marcopulos's Qualifications

Dr. Marcopulos was offered and accepted as an expert in neuropsychology and forensic neuropsychology.[12] Dr. Marcopulos served as the Director of the Neuropsychology Laboratory at Western State Hospital for twenty years.  Approximately 30–40% of the patients at Western State Hospital came from jail settings, and Dr. Marcopulos's job responsibilities included conducting evaluations on patients who had been adjudicated not guilty by reason of insanity "to determine what kind of progress the adjudicated defendants were making in the hospital, and looking at risk assessment to see if they might be ready for a conditional release program." (Tr. 171–72.)  At Western State Hospital, Dr. Marcopulos also conducted neuropsychological, personality, and forensic assessments.  She has conducted on her own "at least a dozen" evaluations of a defendant's competency to stand trial, and has supervised many others.  She has testified as an expert in the field of neuropsychology and has testified once regarding a defendant's competency to stand trial.  She has written approximately seven publications regarding competency to stand trial and has lectured and taught about competency to stand trial since 2010.

### 2.   Dr. Marcopulos's Opinions

Dr. Marcopulos completed a "forensic mental health evaluation of [Bennett], focusing on his competency to stand trial."  (Marcopulos Report 1.)  She conducted a two-and-a-half hour

---

[12] Dr. Marcopulos earned her Bachelor of Arts degree in Psychology from University of Florida, her Master of Arts degree in Clinical Neuropsychology from the University of Victoria, and her Doctor of Philosophy degree in Clinical Neuropsychology from the University of Victoria.  She has been licensed to practice Clinical Psychology in Virginia since 1991, and has been certified in Clinical Neuropsychology by the American Board of Professional Psychology since 1995.  She is currently a Professor in the Department of Graduate Psychology at James Madison University.

interview of Bennett at Northern Neck Regional Jail,[13] spoke with Bennett's attorney, read Dr. Nagele's report, reviewed all but one of the medical records Dr. Nagele reviewed,[14] reviewed the charging documents in the underlying case, and listened to Bennett's post-arrest statement and eleven phone calls Bennett made from jail. She administered one screening tool, but did not conduct a full neuropsychological evaluation because she had access to the one performed by Dr. Nagele.

Dr. Marcopulos reviewed Dr. Nagele's neuropsychological evaluation and Bennett's medical records before she met with Bennett, so even before her interview with Bennett, Dr. Marcopulos "had a good understanding about the cognitive limitations that . . . could potentially impact [Bennett's] trial competence." (Tr. 184.) In order to assess Bennett's competency, Dr. Marcopulos "just engaged in a conversation with [Bennett] about his current legal situation." (Tr. 185.) She asked him what he is charged with, what possible penalties he is facing, what happened in recent hearings, and what strategies he is considering. Bennett knew that he was charged with interstate kidnapping, and that although he had faced charges in state court before, this was his first time in federal court. Bennett "explained how his case wound up in federal court." (Tr. 186.) He identified his co-defendants and stated that he did not have contact with

_____

[13] Dr. Nagele testified that it usually is not possible to identify the presence of an acquired brain injury in one meeting. "[Y]ou might be able to have a conversation with [someone] for an hour or more and not really realize there's anything wrong with [that person]." (Tr. 98–99.) An effective way to identify the disability, is to "com[e] back to that person on a subsequent day" and compare the memories and conversations from the previous day. (Tr. 99.) "[T]hat's where people start to think maybe there's something different or wrong with the way this person's brain is working." (*Id.*)

[14] It is possible that the omission of one of the medical records from Dr. Marcopulos's "Sources of Information" list is a typographical error. Dr. Nagele's list of "Records Reviewed" includes a Halifax Regional Medical Center, Emergency Department Record from August 1, 2001, which is not included in Dr. Marcopulos's list. (*Compare* Nagele Report 2, *with* Marcopulos Report 1–3.) The Court sees no reason why this record would be omitted. Neither party has identified any special importance associated with it.

the other co-defendants and should not have contact with potential witnesses because there might be concerns with "witness tampering." (*Id.*) He identified two possible witnesses in the case, and knew who they both were. He stated that he had discussed with his attorney the possibility of testifying.

Dr. Marcopulos asked Bennett whether he knew the different court personnel. Bennett knew the judge's name, he knew "who the prosecutor was, and fully understood the prosecutor was trying to find him guilty[, and t]hat his defense attorney was trying to assist him . . . ." (Tr. 185.) He stated that he "was in very frequent contact" with his attorney and defense team. (Tr. 187.) Bennett understood that his options include going to trial or pleading guilty and stated that he would choose to "have a judge rather than a jury" because "[h]e felt that a jury would view his crime in a more harsh manner because it involved a minor." (*Id.*)

Bennett was aware that once Dr. Marcopulos wrote her report, the Court would conduct a hearing and "that depending on . . . what the judge decided, [Bennett] could possibly go to Butner in North Carolina." (Tr. 188.) Bennett stated that while he was at Butner, they would "evaluate him again for competence to stand trial, which he refers to as '*confidence*' to stand trial." (*Id.*) Dr. Marcopulos testified that, even though Bennett used an incorrect word, given the context of their discussions, "he understood what [competency] was." (Tr. 188–89.) Bennett "talked about various potential pleas that he was hoping that his attorney would make, or that he . . . had suggested to reduce the length of time."[15] (Tr. 189.)

---

[15] At the evidentiary hearing, in briefing, and at oral argument, Bennett mischaracterized Dr. Marcopulos's Report as stating that Bennett is "considering various plea deals." (Tr. 203; *see also* Mot. 9 ("In her report to the Court, Dr. Marcopulos indicated that Mr. Bennett 'is suggesting and considering various plea deals' and that he is considering 'various possible plea bargains and sentencing ranges for the criminal charge.'" (quoting Marcopulos Report 9)).)

However, as Dr. Marcopulos articulated in her written Report and orally at the evidentiary hearing, her notation that Bennett was "suggesting and considering various plea deals," (Marcopulos Rep. 9), and had "considered several options that he might accept or reject,"

Based on her interview with Bennett and her review of his medical records, Dr.

Marcopulos opined that Bennett understands the nature and consequences of the charges against

him, and has the ability to consult with his attorney. Although Bennett

> certainly has a very lengthy and very well documented history of psychiatric and
> cognitive concerns which could impact trial competence[,] . . . in terms of his
> present abilities, his current abilities, these don't seem to be impacting his ability
> to have a factual understanding of what he's being charged with. And . . . he did
> not give any indication of any faulty reasoning . . . or gross misunderstanding of
> the serious nature of his charges, what he was facing, what . . . his potential
> options were.

(Tr. 190–91.) Ultimately, Dr. Marcopulos concluded that Bennett "clearly has cognitive

limitations; however, when asked specific questions about his particular case, he was able to

demonstrate that he is apprehending the basics of the case." (Tr. 193.)

> [H]is reasoning was not delusional. It wasn't really outrageous or way off. There
> may have been some wishful thinking or some inaccuracies. I wouldn't expect
> him to have complete knowledge or, you know, to have a perfect understanding of
> the court or the court system. But my impression in my conversation with him is
> that he was grasping a lot of the basic facts of the case.

(Tr. 218.)

Although "both psychiatric and cognitive impairment are possible threats to trial

competence," Dr. Marcopulos testified that competence to stand trial could not be determined in

a vacuum by asking only if the defendant has a psychiatric illness or a cognitive impairment.

Histories of developmental disorders, learning disorders, brain injuries, and neurological

illnesses can all "impact a person's cognitive functioning," but whether a defendant is competent

to stand trial is "a very specific question asking the functional capacities of that defendant in

---

(*id.* at 8), "didn't necessarily [indicate that a plea deal had actually been made]." (Tr. 203.) Dr.
Marcopulos "went back and asked whether any deals had been made, and [] was told that there
weren't. But [Bennett] *didn't say* he was considering . . . a particular deal. . . . [H]e was *hoping*
for a deal." (*Id.*) (emphases added).

terms of their understanding, factual and rational understanding of the particular charges, the

court proceedings, and their relationship with their attorney." (*Id.*)

> [I]n my years of working at Western State Hospital, I've actually seen a lot of
> gentlemen like Mr. Bennett where they do have very serious histories of mental
> illness, very significant cognitive impairments, and if I just went by the test
> scores, everybody would be incompetent. But you . . . need to ask the specific
> questions to see what they understand about their particular situation. And even
> individuals who are significantly impaired, when it comes to something that has
> direct impact to them [sic], they are able to apprehend some things. Maybe not
> perfectly . . . . But in terms of the basics, they can . . . get it.
>
> . . . .
>
> [I]f you give Mr. Bennett multiple opportunities and provide information in
> context, and of course the information is meaningful to him, . . . he could
> apprehend or possibly retain sufficient amounts of information such that trial
> competence would not be severely impaired.

(Tr. 221.)

Dr. Marcopulos considered it important to question Bennett about the proceedings against

him because "you can't tell [if a defendant is incompetent to stand trial] just by the testing. What

the testing does is it tells you what the mental defect or disorder might be, you know, give you

the nature of it." (Tr. 223.) In order to determine whether a defendant is in fact incompetent to

stand trial, "it's important to ask very specifically about this trial, this courtroom, and so forth, to

make sure that they understand that." (*Id.*) Thus, although Bennett "fully has the presence of

issues that could impact his trial competence," such as memory impairments, cognitive

limitations, and ongoing psychiatric disturbances, Dr. Marcopulos found that "when [she]

actually asked him specifically about his trial, about his charges, he did recall information that

was found to be mostly accurate. He did demonstrate that he was reasoning through things,

through different scenarios, different possible outcomes, expressing preferences for different

possible outcomes." (Tr. 224.) Ultimately, Dr. Marcopulos opined that Bennett "is not presently

mentally incompetent and he is able to understand the nature and consequences of the proceedings against him and he is able to assist in his defense." (Marcopulos Report 10.)

Dr. Marcopulos recommended that, in working with Bennett, his "cognitive limitations, including memory deficits, and impairment in reading and writing should be taken into consideration." (*Id.*) Also, Bennett "should continue to compensate for these difficulties using the strategies he reported using, such as making simple notes, and asking trusted individuals to read and explain important legal documents to him." (*Id.*)

### IV. Analysis: The Court Cannot Find Bennett Incompetent to Stand Trial

Based on the testimony of Investigator McGrew, Dr. Nagele, and Dr. Marcopulos, and the information from Bennett's jail phone calls, the Court cannot find Bennett incompetent to stand trial. Although Bennett clearly displays cognitive limitations and has a history of head trauma, the Court cannot find, even by a preponderance of the evidence, that Bennett's "mental disease or defect render[s] him . . . unable to understand the nature and consequences of the proceedings against him or assist properly in his defense." *See* 18 U.S.C. § 4241(d).

### A.    Bennett's Arguments that the Court Should Discount Dr. Marcopulos's Opinions Do Not Persuade

The Court finds Dr. Marcopulos's testimony regarding Bennett's present ability to comprehend the basics of the proceeding against him credible, relevant, and persuasive. Although Dr. Nagele is an accomplished neuropsychologist, Dr. Marcopulos's training and experience more directly relate to evaluating a defendant's competence to stand trial, and she tailored her interview with Bennett to determining Bennett's *competence*, rather than to conducting a comprehensive neuropsychological evaluation. Dr. Nagele's failure to ask Bennett *any* questions about the pending case ultimately render the basis of his opinions silent on the pivotal issue before the Court: Bennett's understanding of, and his ability to assist with his

20

defense in, *this* case in *this* court. Thus, Bennett has failed to establish, even by a preponderance of the evidence, his incompetence to stand trial.

Based on his testing, his review of Bennett's medical records, and the information from third parties provided him by Bennett's defense team, Dr. Nagele concluded that Bennett lacked the ability to understand the nature of the proceedings against him and meaningfully participate in his defense. Specifically, Bennett's

> verbal memory impairment would preclude him from reviewing the facts of the case one day, and coming back the next day to discuss them[,] as he would likely only recall 16% of those facts discussed previously. This would also apply to testimony that would be heard in the trial proceedings. [Bennett] would not be able to remember it from one day to the next. His reading and writing impairments would preclude him from accurately writing down these facts, or reading what someone else has written down, as an adjunct to impaired memory.

(Nagele Report 14.) However, as Dr. Marcopulos testified, "the problem [with Dr. Nagele's conclusions regarding Bennett's competence" is . . . the words 'would be' as opposed to 'is he.'" (Tr. 225.)

Dr. Marcopulos correctly identified that "competency to stand trial is a very specific legal question." (Tr. 177.) An evaluation of a defendant's competence to stand trial is "a very specific question asking the functional capacities of that defendant in terms of their . . . factual and rational understanding of the particular charges, the court proceedings, and their relationship with their attorney." (Tr. 178.) And although Dr. Nagele opined that Bennett "does not have sufficient cognitive ability to consult with his attorney and form a reasonable degree of understanding of the nature and consequence of the proceedings, nor does he have the cognitive capacity to understand the full nature of the proceedings against him," he based this opinion on his findings regarding Bennett's intellectual, memory, and adaptive functioning abilities, gleaned from a comprehensive neuropsychological evaluation, not on any assessment of how Bennett currently understands his case or interacts with his attorney. (Nagele Report 14.)

21

Bennett argues that Dr. Nagele's and Investigator McGrew's opinions regarding

Bennett's competency are entitled to more weight than Dr. Marcopulos's, in part because they

each spent more time with Bennett than Dr. Marcopulos.

> After spending 2 ½ hours with Mr. Bennett, Dr. Marcopulos concluded that Mr. Bennett was competent to stand trial because[,] despite having cognitive limitations, memory problems and an abnormal brain, he could answer questions about his case.

(Mot. 8.)

> When Dr. Marcopulos was confronted about her conversations with Mr. Bennett and what he told her about his case, she said it "sounded reasonable" and "matched up more or less." However, as the [phone call] transcripts make clear, what sounded reasonable to Dr. Marcopulos was not in fact true. In fairness to Dr. Marcopulos, she only met with Mr. Bennett one time and did not push Mr. Bennett to explain the things he was telling her to see if he even understood what he was saying. But Investigator McGrew and the defense team, who have met with Mr. Bennett at least once a week since he has been incarcerated, have been able to make these observations.

(*Id.* at 11 (internal citations omitted).)

Bennett also asserts that Dr. Marcopulos's opinions lack persuasive power because she

did not conduct as many neurological tests as Dr. Nagele. "Dr. Marcopulos never asked Mr.

Bennett to engage in any problem-solving activities, which would be what he would need to do

to consider defenses, plea offers, and whether or not to plead guilty or not guilty." (Mot. 11; *see

also* Def.'s Reply 3 ("Dr. Nagle [sic] was able to assess Mr. Bennett's level of impairment after

two thorough meetings with Mr. Bennett. He did a comprehensive record review, evaluated

adaptive skills assessments completed by the family, and other collateral source material

provided to him by the defense team.").)

The Court cannot conclude that Dr. Marcopulos's opinions are entitled to less weight

than Dr. Nagele's because she spent less time with Bennett, or did not conduct the same tests.

Dr. Marcopulos had access to nearly all of the same information on which Dr. Nagele relied, and

to all of the "raw data" from those tests. (Tr. 191–92.) She also reviewed "pertinent medical, academic, psychosocial[,] and legal history." (Marcopulos Report 1.) Because Dr. Nagele conducted a comprehensive examination, Dr. Marcopulos had a plethora of data to review. And she asked additional questions targeted at evaluating Bennett's "factual and rational knowledge of court personnel and proceedings and ability to work effectively with his attorney." (*Id.*) Dr. Marcopulos displayed a nuanced and thorough understanding of the legal standard and process governing determinations of competence to stand trial, making her opinion on that issue even more credible. Finally, unlike Dr. Nagele, the majority of Dr. Marcopulos's professional experience directly pertains to evaluating a criminal defendant's competence to stand trial.

Given the extensive amount of information Dr. Marcopulos reviewed, the targeted questions she asked Bennett, her expertise in the area of forensic neuropsychology, her highly relevant experience working with criminal defendants, and Dr. Nagele's failure to address the issue of competency head-on when evaluating Bennett, the Court finds Dr. Marcopulos's opinions that Bennett "is not presently mentally incompetent and he is able to understand the nature and consequences of the proceedings against him and he is able to assist in his defense," (Marcopulos Report 10), relevant and persuasive. Even if Bennett did not bear the burden of proof, Dr. Nagele's testimony does not meet the legal standard for this Court to find otherwise.

## B.    Bennett Has a Long-Standing Cognitive Impairment

Both experts agree that Bennett has "long-standing cognitive impairment." (Tr. 234.) Dr. Nagele opined that, within a reasonable degree of neuropsychological certainty, Bennett suffered "multiple brain injuries beginning at birth and occurring throughout [his] lifespan." (Nagele Report 13–14.) These brain injuries, at least in part, resulted in Bennett "functioning in the Borderline to Extremely Low range for intellectual functioning, in the Severely Impaired

range for verbal memory and higher executive functions, and in the Extremely Low range for Adaptive Functioning." (*Id.* at 13.) Dr. Marcopulos testified that Bennett clearly "has a long history of cognitive impairment of probably a neurodevelopmental nature. He also has a psychiatric illness . . . . [and] a history of substance abuse . . . . So he . . . fully has the presence of issues that could impact his trial competence." (Tr. 224.) Investigator McGrew's testimony regarding her interactions with Bennett did not undermine either expert's findings, and much of what she described was consistent with the experts' opinions.

### C. Bennett Has Not Established by a Preponderance of the Evidence that He is Incompetent to Stand Trial

It is clear from both expert reports and from the testimony of all three witnesses that Bennett suffers from cognitive, intellectual, and memory deficiencies that render him less able than some other criminal defendants to understand the charges or assist counsel in his defense. This Court, however, must look to the "unique circumstances of the case" and determine whether Bennett manifests a "present inability to assist counsel or understand the charges." *See Burket*, 208 F.3d at 192. "[N]either low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." *Leggett*, 162 F.3d at 244 (citing *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995)). The decision is fact-specific, and "[t]here are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Drope*, 420 U.S. at 180. For the reasons stated below, despite Bennett's cognitive and memory limitations, the Court cannot find by a preponderance of the evidence that Bennett is unable to "understand the nature and consequences of the proceedings against him or to assist properly in his defense." *See* 18 U.S.C. § 4241(d).

1.  **Bennett Has Not Established that He is Unable to Understand the Nature and Consequences of the Proceedings Against Him**

For this Court to find Bennett incompetent to stand trial, it must find by a preponderance

of the evidence that Bennett is "unable to understand the nature and consequences of the

proceedings against him." 18 U.S.C. § 4241(d). Looking to the "unique circumstances of

[Bennett's] case," *Burket*, 208 F.3d at 192, the Court must find Bennett competent unless it finds

that he lacks a "rational as well as factual understanding of the proceedings against him." *Dusky*,

362 U.S. at 402; *see also Leggett*, 162 F.3d at 242.[16] Bennett's attempts to establish

incompetence rest in significant part on inaccuracies in information Bennett recounted in his

recorded phone calls from prison.[17] But the transcripts from those conversations do not establish

---

[16] Bennett argues that *Godinez v. Moran*, 509 U.S. 389 (1993), "further explained having a reasonable degree of rational understanding as having decision-making capacities." (Mot. 2.) *Godinez* addressed the standard of competency for pleading guilty or waiving the right to counsel and "reject[ed]" the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that is higher than (or even different from) the *Dusky* [competence to stand trial] standard." 509 U.S. at 398. Thus, *Godinez* neither expanded nor retracted the *Dusky* standard.

Although Bennett's counsel conceded the limited scope of *Godinez* at oral argument, Bennett's arguments for a finding of incompetence seem to rely on a competency level higher than that articulated in Supreme Court precedent. Bennett argues that his purported inability to fully and accurately process, in real-time, or near real-time, events at trial in order to simultaneously assist his lawyer mandates a finding of incompetency. Even if the Court were sympathetic to such a position, it does not reflect the existing standard for determining competence. And district courts must apply the law as it stands, rather than base a decision on what some might wish the law would be.

[17] Investigator McGrew and both experts reviewed recordings of phone calls Bennett made from jai, all of which occurred between August 2016 and December 2016. Investigator McGrew and others in the FPD reviewed 210 phone calls; Dr. Nagele reviewed seventy-one of those phone calls that the FPD determined to be "substantive," (Tr. 67–69); Dr. Marcopulos reviewed eleven of those phone calls. Transcripts were made and provided to the Court of the eleven phone calls that Dr. Marcopulos reviewed. (*See* Gov't Ex. 1A–1J, ECF No. 87-1.)

All conversations occurred relatively early in the proceedings of Bennett's case. The first phone call occurred on August 12, 2016, two days after Bennett's first appearance in this federal Court, and the last phone call relied upon happened on December 3, 2016, after trial was delayed at Bennett's request, and one month before his formal motion for a competency evaluation. The phone calls are conversations between Bennett and unidentified individuals in which Bennett

the record Bennett seeks to portray. Despite Bennett's cognitive limitations and memory impairments, the Court cannot find, even by a preponderance of the evidence, that Bennett lacks such an understanding.

Bennett suggests that this Court can find that he displayed legal incompetence when communicating unrealistic outcomes of the case, when conveying case developments, and when talking about plea offers that never existed. Even without the expert testimony of Dr. Marcopulos, the Court cannot conclude that Bennett's evidence supports a finding of incompetence. Considering all the evidence before the Court, Bennett fails to establish by a preponderance of the evidence that he is legally incompetent.

### a. Bennett's Conversations Do Not, by a Preponderance of the Evidence, Reflect an Unrealistic Understanding of His Case

Bennett contends that this Court should find, when considering the phone calls, that he did not have a realistic understanding of the possible outcomes of his case. But the calls relied upon reflecting "unrealistic outcomes" date from Bennett's first three weeks in federal custody, a time during which any defendant new to the federal system, like Bennett, would be learning the specifics of what a federal charge entailed. For instance, early on, Bennett did not accurately describe to others his potential penalties and he jumbled concepts about the guidelines.[18] Bennett's erroneous statement of what his lawyer was "gonna try for" occurred so early in the case that the Court cannot find that it more likely stems from an inability to understand the nature of the charges and their consequences rather than other factors. Although Bennett plainly

---

discusses developments and circumstances in his criminal case. Presumably, both parties relied on the most persuasive conversations when presenting their arguments regarding Bennett's competence to this Court.

[18] After his initial appearance on August 12, 2016, Bennett discussed with an unidentified female the penalties he faced. He told this person that "[t]he starting maximum of this sentence is 20 to life. . . . But [my lawyer is] gonna try to go for the five years of supervised probation, and a $250,000 fine. . . . $100 a month." (Gov't Ex. 1A, 5:11–17.)

misstated eligibility for five years of probation, he nonetheless conveyed the minimum and maximum possible sentences correctly. Moreover, these statements occurred the same day as his brief first appearance and meeting with defense counsel. A September 2, 2016 phone call in which Bennett misstated information about the federal guidelines[19] also does not persuade that Bennett lacks the ability to understand the federal charges against him. That call also occurred early in Bennett's case and, like other calls, identifies other outcomes correctly, such as the starting maximum penalties.

Further, Bennett's August 12, 2016 prediction of his release on "probation," by which he likely meant "bond," does not support a finding by the preponderance of the evidence that he lacked understanding of the proceedings against him.[20] Bennett's statement that he was going to be "let out" ultimately proved incorrect, but his description of the federal bond process as administered through the pretrial services arm of the probation office, gleaned after one hearing, largely was correct.[21] These accurate and inaccurate statements early in the case—even

---

[19] During that phone call, Bennett reported incorrectly that "the actual sentence is 10 years, right, by the guidelines. . . . You know how the guidelines work? They go from zero to 10. . . . You might get the mid, you might get the 10, or you might get the low end." (Gov't Ex. 1B, 8:11–17.) Bennett also told an unidentified male correctly that he was facing a sentence of "20 to life. But . . . abduction is 10 years. So they going by that. . . . They going by the guidelines, yo." (Gov't Ex. 1C, 10:7–11.)

[20] After his initial appearance on August 12, 2016, Bennett talked on the phone with an unidentified female about the possibility of getting bond at his next court hearing. His next hearing, indeed, was a bond hearing. He stated that "they going to let me out. I'm going to be on federal probation." (Gov't Ex. 1A 1:9–10.) "John will have to sign my bond. They don't get no—you ain't pay no money. He just got to sign the paper." (Id. 1:20–21.)

He also talked about one of his co-defendants. "The other boy already at home. . . . He's been out." (Id. 3:8–10.) "[T]he feds didn't pick my case up until they picked [him] up. . . . They picked him up on the 2nd of August. The indicted me on August the 2nd." (Id. 3:11–17.)

[21] Bennett's assertion that no money bond would be posted and someone would just "sign the paper" accurately describes bond operations in the Richmond Division. Bennett correctly stated the date of his indictment as August 2, 2016. (ECF No. 9.) He also rightly identified the maximum penalty he faced. No information before the Court reflects the accuracy

cumulatively—do not establish by a preponderance of the evidence that Bennett's current understanding meets the standard this Court must apply to find him incompetent to stand trial.

        **b.**        **Bennett's Conversations Do Not, by a Preponderance of the Evidence, Reflect a Significant Misunderstanding of Developments in His Case**

Despite Bennett's arguments to the contrary, other conversations reflect an appropriate understanding of case developments. On September 2, 2016, Bennett correctly told an unidentified male that his trial was scheduled for October 11, 2016, (*see* ECF No. 33) and that he would need "some clothes to wear" to trial. (Gov't Ex. 1B, 7:23–25.) On September 30, 2016, Bennett told an unidentified female that his lawyer "filed for this motion for a continuance," because "she want[s him] to get evaluated." (Gov't Ex. 1E, 11:5–11.) Bennett was correct.[22] Then, on December 3, 2016, Bennett said that his lawyer "got a—a psychiatrist to come from Philadelphia. . . . To evaluate me."[23] (Gov't Ex. 1J 16:5–8.) Bennett told the unidentified female, "I want ya'll [sic] to tell her about my previous mental issues. . . . She—she going with the—the defense that I got a mind of a child, and I wouldn't think of doing nothing that like [sic]." (*Id.* 16:10–15.) All of these statements accurately track the then-existing progress of Bennett's case before the Court.

---

of Bennett's statement that "the feds" "picked up" his co-defendant on August 2, 2016, but Bennett's assertion that one of his co-defendant was "already at home" on August 12, 2016, appears to be incorrect. (*See* August 15, 2016 O. Setting Conditions of Release as to Troy E. Patterson, ECF No. 29.)

[22] On September 21, 2016, Bennett filed a Motion to Continue Trial Date, (ECF No. 43), requesting additional time to "obtain all the mental health records, review those records[,] and perhaps have Mr. Bennett evaluated." (Mot. Continue ¶ 4.)

[23] Although nothing in the record reflects the date on which Dr. Nagele was retained to evaluate Bennett, he came from the Philadelphia area and evaluated Bennett on December 8 and 9, 2016, just after this phone call. (Tr. 68.)

### c.    Bennett's Conversations Do Not, by a Preponderance of the Evidence, Reflect a Misunderstanding that the United States Offered Plea Deals

Bennett argues that all talk of plea deals reflect incompetence because the government never has offered any plea in his case. No pleas have been offered, (Tr. 30.), but the record does not stop there. Most persuasively, Bennett acknowledged to Dr. Marcopulos that he had *not* been offered any plea deals. (Tr. 203 ("I went back and asked whether any deals had been made, and I was told that there weren't [sic]. But he didn't say he was considering . . . a particular deal. . . . [H]e was hoping for a deal.").) Ultimately, when directly asked by an outsider whether he had been offered plea deals, Bennett answered correctly. Earlier statements to the contrary do not contravene his accurate understanding of circumstances today.

Even as to individual conversations, Bennett does not meet his burden to demonstrate incompetence by a preponderance of the evidence. In some instances, such as Bennett's conversation after a co-defendant was dismissed from the case, the cited conversation could as likely reflect a positive presentation of Bennett's case to others as it could suggest a lack of understanding of the proceedings.[24] Although Investigator McGrew contended that Bennett, more so than other defendants she has known, "is stuck and cannot be moved forward" in his ability to "understand realistically what [he is] facing, and how severe it is," (Tr. 41), she also

---

[24] As noted above, the United States dismissed charges against one of Bennett's co-defendants and dismissed that co-defendant from the case on September 2, 2016. When speaking to an unidentified male on that day, Bennett stated that his lawyer "told the prosecutor how she feel in the case, and if you going to drop one charge, you need to drop all of them." (Gov't Ex. 1B 6:16–18.) "[M]y lawyer's, like, man, with the grace of God I'll be home." (*Id.* 7:18–19.) The conversation ended with Bennett saying that his lawyer was "trying to get that 20 to life off the table, then she said we going to go from there." (*Id.* 8:5–6.)

Investigator McGrew confirmed that Bennett's counsel had told Bennett she was "trying to get the 20-year mandatory minimum off the table." (Tr. 26.) No evidence is before the Court regarding the accuracy of the other statements, but Bennett's statements indicate a hopeful outlook on the outcome of his trial, and the Court does not find it unlikely that Bennett would try to stay positive for his family and friends.

testified that it is not uncommon for criminal defendants to have unrealistically optimistic views of their cases, (Tr. 39). And, despite the fact that Bennett told others that the United States offered pleas when they did not,[25] even considering Investigator McGrew's testimony that Bennett was "stuck" in his view of the case, Bennett has not established by a preponderance of the evidence that these statements amount to incompetence rather than any other likely explanation such as remaining "hopeful," or attempting to stay positive for family. Finally, and perhaps most importantly, Bennett reported plea events accurately to Dr. Marcopulos.

### d. Bennett's Reliance on Recorded Phone Call Conversations Does Not Persuade

In sum, Bennett made many of his inaccurate statements in the first months after indictment, before time allowed him to better understand the case and the federal system. All of the phone calls before the Court occurred in the first four months after his indictment, almost four months before Dr. Marcopulos performed her evaluation. Finally, Bennett made many accurate statements in the phone calls. Even considering Investigator McGrew's testimony and Dr. Nagele's evaluation, the Court finds that the phone calls, overall, are consistent with Dr. Marcopulos's opinion that Bennett is "grasping a lot of the basic facts of the case." (Tr. 218.)

That said, Bennett's cognitive limitations give the Court pause, and his memory impairments amplify the seriousness of his limitations. But despite Bennett's disadvantages, the Court cannot find by a preponderance of the evidence that Bennett lacks "a rational as well as factual understanding of the proceedings against him." *See Dusky*, 362 U.S. at 402. Bennett

---

[25] On October 26, 2016, Bennett told an unidentified female that "they came at me with a plea." (Gov't Ex. 1G 13:5–6.) He stated that he was offered a plea deal for seventeen years but his "lawyer didn't take it. She said we ain't taking that." (*Id.* 13:8–11.) On October 29, 2016, Bennett told an unidentified male that his attorney said his "guidelines is from zero to 20, and the DA—the prosecutor had offered [him] a plea for 17 years, but we're not taking it. I can beat this because everything do not adds [sic] up." (Gov't Ex. 1H 14:16–19.) Then, on November 27, 2016, Bennett told an unidentified female that "they offered me 10 years," but his lawyer "ain't take it." (Gov't Ex. 1I 15:5–10.)

demonstrates "that he is apprehending the basics of the case." (Tr. 193.) When Bennett was asked "specifically about his trial, about his charges, he did recall information that was found to be mostly accurate. He did demonstrate that he was reasoning through things, through different scenarios, different possible outcomes, expressing preferences for different possible outcomes." (Tr. 224.) The Court cannot find by a preponderance of the evidence that Bennett does not meet the standard for having a present rational and factual understanding of the proceedings against him. *See* 18 U.S.C. § 4241(d); *see also Dusky*, 362 U.S. at 402.

### 2. Bennett Has Not Established by a Preponderance of the Evidence that He is Unable to Assist in His Defense

As a criminal defendant, Bennett faces many "strategic choices: In consultation with his attorney, he may be called upon to decide, among other things, whether (and how) to put on a defense and whether to raise one or more affirmative defenses." *Godinez v. Moran*, 509 U.S. 389, 398 (1993). In order for this Court to find Bennett incompetent to stand trial, he must prove by a preponderance of the evidence that he does not have the ability to consult with his lawyer and make these decisions with a "reasonable degree of rational understanding." *Dusky*, 362 U.S. at 402. For the reasons stated above, the Court finds Dr. Marcopulos's testimony credible, relevant, and persuasive regarding Bennett's ability to assist in his own defense.

Bennett told Dr. Marcopulos that he "was in very frequent contact" with his attorney and defense team, (Tr. 187), and Investigator McGrew's testimony corroborated this, (Tr. 14–15). Dr. Marcopulos opined that Bennett knew "[t]hat his defense attorney was trying to assist him," (Tr. 185), and he had discussed with his attorney the possibility of testifying, (Tr. 187). Bennett understood that his options include going to trial or pleading guilty and stated that he would choose to "have a judge rather than a jury" because "[h]e felt that a jury would view his crime in a more harsh manner because it involved a minor." (*Id.*)

31

Bennett was able to explain to Dr. Marcopulos "how his case wound up in federal court." (Tr. 186.) He identified his co-defendants and stated that he did not have contact with the other co-defendants and should not have contact with potential witnesses because there might be concerns with "witness tampering." (*Id.*) He identified two possible witnesses in the case, and knew who they both were. (Tr. 186–87.) Bennett knew the judge's name, he knew "who the prosecutor was, and fully understood the prosecutor was trying to find him guilty." (Tr. 185.)

Investigator McGrew also recounted strategies Bennett and Bennett's defense team currently utilize to facilitate Bennett's understanding of the case and to compensate for some of his limitations. For example, Bennett's attorney wrote down for Bennett the penalties he is facing, (Tr. 27), they maintain frequent contact with Bennett, (Tr. 14–15), and Bennett writes down important phone numbers, (Tr. 27–28).

The Court does not disregard Bennett's cognitive limitations, or the memory impairments that amplify the seriousness of his limitations. But the Court also does not adopt a new requirement, advanced by Bennett, that competence to stand trial requires a specific finding that a defendant can, in real-time, or near real-time, intelligently assist counsel in strategic decisions during an ongoing trial. *Godinez* does not expand the standard for competence to stand trial to this degree. *See, e.g.*, *Atkins v. Virginia*, 536 U.S. 304, 318 (holding that severely mentally impaired people are not necessarily incompetent to stand trial even though "by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others"); *United States v. Robinson*, 404 F.3d 850, 856–58 (4th Cir. 2005) (affirming district court's finding that defendant was competent to stand trial even though testing indicated that defendant had an IQ of 70, in the "borderline functional"

32

range, had a "variety of mental disorders, including attention-deficit/hyperactivity disorder (ADHD), reading disorder, mathematics disorder, expressive language disorder, provisional polysubstance abuse, schizotypal personality disorder, and borderline intellectual functioning," and possibly had "some subtle neurological problems"); *Beck v. Angelone*, 261 F.3d 377, 390–92 (4th Cir. 2001) (denying habeas relief to a defendant who alleged he was incompetent to stand trial, even though expert testimony indicated that the defendant had "a fairly severe learning disability with an IQ in the low average range," ADHD, depression, and a personality disorder because the court could not "conclude that 'reasonable jurists' would find the question of whether [the defendant] was competent . . . 'debatable.'").

Given the record before the Court, and applying binding law, the Court cannot find by a preponderance of the evidence that Bennett fails to meet the standard for being able to assist properly in his defense. *See* 18 U.S.C. § 4241(d); *see also Dusky*, 362 U.S. at 402.

## V. Rehabilitation

Disquieted by Bennett's original argument that he was incompetent and unable to be restored to competence, and therefore should be released in order to not violate due process or equal protection, the Court sought additional briefing. Bennett now agrees with the United States that a finding of incompetency *must* result in a commitment to the custody of the Attorney General. (Def.'s Suppl. Br. 3, ECF No. 90.)

Bennett originally argued, under *Jackson v. Indiana*, 406 U.S. 715 (1972), that the Court should *not* commit him if it found him incompetent because the "indefinite commitment of [an] incompetent person not likely to attain competency violates due process and equal protection."[26]

---

[26] *Jackson* held that an Indiana state court's commitment of a criminal defendant until "the defendant is sane" violated the United States Constitution's guarantees to equal protection and due process. *Jackson*, 406 U.S. at 719. The commitment violated the Equal Protection Clause because it "subject[ed] Jackson to a more lenient commitment standard and to a more

(Mot. 13.) Because Bennett's incompetency argument relied on his assertion that his mental disease or defect "is a permanent injury and the brain cells cannot be regenerated," (Mot. 12), the Court expressed concern that a finding of incompetence and any resulting potentially indefinite commitment could, ultimately, violate due process and equal protection because Bennett would be committed without hope of restoration and eventual trial. *See Jackson*, 406 U.S. at 725. However, Bennett now states that "[t]he procedures required by [18 U.S.C. § 4246] prevent an unconstitutional confinement under *Jackson*." (Def.'s Suppl. Br. 5.) Regardless, the decision issued today renders the constitutional concern moot because the Court does not find Bennett incompetent to stand trial.

## VI. Conclusion

For the foregoing reasons, the Court will deny Bennett's Motion. (ECF No. 84.) An appropriate order will issue.

/s/

M. Hannah Lauck
United States District Judge

Date: 6 - 16 - 17
Richmond, Virginia

---

stringent standard of release than those generally applicable to all others not charged with offenses." *Id.* at 730. In order to comply with due process, *Jackson* held that

> a person charged . . . with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the [government] must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant.

*Id.* at 738.